UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM SIMS,

        Plaintiff,

v.                                         Case No. 3:18-cv-892-J-34JBT

ALEXIS FIGUEROA,

        Defendant.

_____

### ORDER

#### I.    Status

Plaintiff William Sims, an inmate of the Florida penal system, initiated this action by mailbox rule on July 18, 2018, by filing a pro se Civil Rights Complaint under 42 U.S.C. § 1983 (Doc. 1). In the Complaint, Sims alleges Alexis Figueroa was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[1] As relief, Sims seeks injunctive relief, as well as compensatory and punitive damages. Before the Court are three motions. Sims filed a Motion to Compel Discovery and Deem Matters in Admissions as Admitted (Motion to Compel; Doc. 36). In response, Figueroa filed a motion seeking to withdraw his technical admissions. See Defendant, Dr. Alexis Figueroa's, Response to Plaintiff's Motion to Compel Discovery and Deem Matters in

---

[1] In an Order filed August 27, 2019, the Court partially granted Figueroa's motion to dismiss and dismissed Sim's claim against Figueroa in his official capacity. See Order; Doc. 16.

Admissions Admitted and Defendant's Motion to Withdraw Admissions or in the Alternative Motion for Relief from Technical Admissions (Motion to Withdraw; Doc. 39). Figueroa also filed a Motion for Summary Judgment (Motion; Doc. 38). Sims filed a response in opposition. See Declaration in Opposition to Defendant's Motion for Summary Judgment (Response; Doc. 44) with exhibits (Resp. Ex.). The motions are ripe for review.

## II.     Sims' Allegations

In his verified Complaint,[2] Sims alleges that he had a colonoscopy on August 16, 2017, and was given follow-up instructions to return in eight weeks. Complaint at 4. He states that he experienced "gross rectal bleeding" within a few days and was given "a dose of magnesia." Id. He avers that the Florida Department of Corrections (FDOC) transferred him to Suwannee Correctional Institution Annex (SCIA) on August 30, 2017. Id. According to Sims, he informed Figueroa ("the primary health care provider" at SCIA) about his "ongoing rectal bleeding" on September 8th, and Figueroa advised that he would refer Sims to a gastroenterologist for a consultation. Id. Sims maintains that he had an "outside appointment" concerning his prostate cancer with Dr. [Vernon] Montoya (an oncologist) on October 12th, at which time he informed Montoya about his rectal bleeding. Id. According to Sims, Montoya performed a rectal examination, determined he had rectal bleeding, and ordered a gastroenterology consultation. Id. at 4-5. Sims states that

---

[2] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [the plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [the plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

Figueroa advised Sims that he would not refer him to a gastroenterologist because he had "his own treatment plan" for Sims. Id. at 5.

Sims avers that he accessed sick call at the institution on October 31, November 3, 18, and 21, and December 5 before he received "any form of medical treatment." Id. He asserts that Defendant Figueroa saw him in mid-December 2017, and prescribed a stool softener, fiber laxative, and hydrocortisone. Id. According to Sims, there was no follow-up appointment, instead Figueroa just renewed the medications. Id. He avers that Montoya saw him on January 18, 2018, and again ordered that he see a gastroenterologist. Id. Sims declares that he continued to complain about rectal bleeding and pain, "but did not receive any meaningful treatment." Id. He states that Montoya was "furious" when he saw him on July 5th because Sims had not seen a gastroenterologist. Id. at 6. Sims proclaims that Montoya informed him that Centurion "was trying to save money," instead of providing adequate medical care. Id.

### III.     Motion to Compel Discovery

In the Motion to Compel, Sims argues that Figueroa failed to respond to his interrogatories and requests for admissions, and moves the Court to both order Figueroa to respond and to also deem the interrogatories and request for admissions admitted pursuant to Federal Rule of Civil Procedure 36(a)(3). Motion to Compel at 1-3. In response, Figueroa concedes that his responses to Sims' discovery requests were untimely and requests that he be permitted to withdraw the technical admissions pursuant to Rule 36(b). Motion to Withdraw at 3-8. Additionally, Figueroa contends that the Motion to Compel is moot because he responded to the discovery requests on August 12, 2020. Id. at 9.

According to Rule 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." However, the Rule also provides for the opportunity to withdraw a Rule 36(a)(3) default admission. Fed. R. Civ. P. 36(b). Under Rule 36(b), the Court "may permit withdrawal or amendment [of an admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Id. The Eleventh Circuit has set forth:

> a two-part test in deciding whether to grant or deny a motion to withdraw or amend admissions. Perez, 297 F.3d at 1264.[3] "First, the court should consider whether the withdrawal will subserve the presentation of the merits, and second, it must determine whether the withdrawal will prejudice the party who obtained the admissions in its presentation of the case." Id. This two-part test is not permissive and "[a] district court abuses its discretion under Rule 36(b) in denying a motion to withdraw or amend admissions when it applies some other criterion beyond the two-part test—or grossly misapplies the two-part test—in making its ruling." Id. at 1265.

In re Fancher, 802 F. App'x 538, 543 (11th Cir. 2020).

On June 25, 2020, the Court directed Figueroa to respond to Sims' discovery requests by July 27, 2020. Doc. 33. Figueroa represents that he responded to the requests on August 12, 2020. Upon review of the interrogatories and requests for admissions attached to the Motion to Compel, if these admissions, which Figueroa contests, were to stand, they would prevent the Court from determining the truth as to the merits of Sims' Complaint. Moreover, the Court has not set a trial date and Sims received

---

[3] Perez v. Miami-Dade County, 297 F.3d 1255 (11th Cir. 2002).

Figueroa's responses before the filing of the motion for summary judgment, thus Sims would not be prejudiced from the granting of the Motion to Withdraw. To the extent Sims requests Figueroa respond, that request is now moot. As to Sims' request that these matters be deemed admitted, the Court finds that granting withdrawal of the admissions would promote the presentation of the merits and would not prejudice Sims. As such, Sims' Motion to Compel is due to be denied and Figueroa's Motion to Withdraw is due to be granted.

### IV.    Summary Judgment Standard

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate,

a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Of course, "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to pro se litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" Nalls v. Coleman Low Fed. Inst., 307 F. App'x 296, 298 (11th Cir. 2009) (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998)).

## V.     Eighth Amendment Standard

Pursuant to the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). "To establish an Eighth Amendment violation, a prisoner must satisfy both an

objective and subjective inquiry regarding a prison official's conduct." Oliver v. Fuhrman, 739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id. The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.
>
> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eleventh circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152,

8

> 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir.2003) (quotation omitted).

Easley v. Dep't of Corr., 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem). However, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897

9

(11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

## VI.  Analysis and Conclusions

In the Motion, Figueroa argues that his treatment of Sims did not violate the Eighth Amendment. Figueroa maintains that Sims has failed to establish a deliberate indifference claim because Figueroa provided Sims with adequate medical care and Sims is merely in disagreement with the care provided. Motion at 8. He further argues that Sims acknowledged in his Complaint that Figueroa created a treatment plan for him and Sims' own allegations demonstrate that he received adequate medical care in the form of consultations with Figueroa and outside specialists, various prescriptions, and at least one colonoscopy procedure. Id. According to Figueroa, these allegations demonstrate at most a disagreement over Figueroa's medical judgment as it relates to Sims' treatment plan, which does not support an Eighth Amendment claim. Id.

In his Response, Sims contends that Figueroa did not attempt to treat his medical condition at the time Sims first met with Figueroa or after Figueroa reviewed a report from an outside physician, Montoya, recommending a treatment plan. Response at 2-3. According to Sims, not until after he filed a grievance did Figueroa prescribe medication, and Figueroa never followed up with him concerning the medication's effectiveness. Id. at 3. Sims maintains that Figueroa was aware of Montoya's concerns but did not provide any treatment or follow Montoya's recommendation to send Sims to a gastroenterologist.

10

Id. 3-5. Likewise, Sims asserts that he made several sick-call requests concerning his rectal bleeding and pain, but Figueroa did not provide treatment. Id. at 4. Sims avers that from September 8, 2017, through June 5, 2019, Figueroa only provided treatment once, which Sims describes as "cursory." Id. at 5. Sims states that once he was transferred to another institution, he eventually saw a gastroenterologist on March 23, 2020, who determined that Sims suffered from severe hemorrhoids due to the lack of treatment he received earlier. Id. at 6.

The documents Sims submitted reflect that on August 16, 2017, Sims, who has a history of prostate cancer, had a colonoscopy performed by an outside gastroenterologist that revealed a polypectomy and hemorrhoids. Resp. Exs. A; C; E. On September 8, 2017, Sims had a follow-up appointment with Figueroa, after which Figueroa submitted two consult requests to Centurion for approval, one for a gastroenterologist and the other for an oncologist. Resp. Exs. A; B. The consultation request form for the gastroenterologist reflects that Figueroa provisionally diagnosed Sims with, among other things, rectal bleeding. Resp. Ex. B. In the appointment date section of the form, the word pending was struck through and the acronym ATP was written and circled next to it. Id.

Sims did, however, receive a consultation with an oncologist, Montoya, on October 12, 2017. Resp. Ex. C. Montoya's report reflects that following the August colonoscopy, Sims experienced gastrointestinal bleeding. Id. Montoya made the following notation:

> GI bleed. It is unclear why the patient was ATP'd as he had a colonoscopy and he was found to have a polyp as well as hemorrhoids. The patient has continued GI bleeding. Therefore, GI follow up is actually appropriate. We will make a referral back to Gastroenterology.

Id. On October 12, 2017, based on Montoya's report, prison medical staff submitted a second referral for a gastroenterologist. Resp. Ex. D. Figueroa met with Sims the next day and his notes reflect "no new changes" following Sims' appointment with Montoya and Sims should continue on his current medicine, have lab work done, and have a follow-up appointment in three months. Id. During the three-month period awaiting his follow-up exam with Figueroa, Sims made four sick-call requests on October 30, 2017, November 15, 2017, November 20, 2017, and December 1, 2017. Resp. Ex. F. A nurse saw him within a week of each request. Id.

On December 14, 2017, Sims had his follow-up appointment with Figueroa about his rectal bleeding and hemorrhoids, at which Sims complained that "I am tired of this problem that won't go away." Resp. Ex. E. Figueroa performed a rectal exam, which showed an inflamed hemorrhoid was "still present." Id. Figueroa notated that he believed the hemorrhoid could be the cause of the rectal bleeding. Id. Figueroa wrote a prescription, and although the handwriting makes it difficult to determine what type of medicine he prescribed, see id., Sims states that Figueroa prescribed a stool softener, fiber laxative, and hydrocortisone. Complaint at 5.

Sims had a follow-up appointment with Montoya on January 11, 2018, the report of which Figueroa received on February 6, 2018. Resp. Ex. G. Montoya noted that Sims' prostate cancer was stable and he was supposed to get a follow-up colonoscopy to examine his rectal bleeding but it had not been done. Id. Under the "Assessment and Plan" heading, Montoya wrote in bold "[w]e will Re-consult Gastroenterology. This is urgent, due to possible GI bleeding." Id.

Back in prison, Sims met with a nurse on January 16, 2018, and then with Figueroa on January 20, 2018, during which they discussed Sims' rectal bleeding issue. Resp. Ex. H. Sims made five sick-call requests complaining about the bleeding between January 31, 2018, and April 26, 2018, and was seen by a nurse for at least three of those requests. Resp. Ex. I. On July 5, 2018, Sims had another consultation with Montoya, in which he noted Sims' cancer was stable but also noted Sims had a history of gastrointestinal bleeding. Resp. Ex. J. Montoya wrote, "[w]e will again refer him to Gastroenterology. This is urgent; to evaluate GI bleeding." Id. Figueroa met with Sims four days later on July 9, 2018. Resp. Ex. K. Figueroa's notes reflects that the request for a gastroenterologist consult had been discussed with the regional medical director. Id. However, Figueroa wrote that "due to the fact that [the] GI [doctor] stated on August 16, 2017[,] that the cause of [the] rectal bleeding was an inflamed hemorrhoid, this could be handled on site." Id. According to this document, Sims had no complaints of rectal bleeding at the time of the July 9, 2018 appointment. Id. Indeed, it appears as though the bleeding had stopped for a period of time, because on September 11, 2018, Sims submitted an inmate sick-call request in which he wrote "reoccurrence of rectal bleeding." Resp. Ex. I (emphasis added). Sims sick-call request was granted, and he was seen on September 18, 2018. Id.

On October 4, 2018, Sims met with Montoya again. Resp. Ex. L. The consult report, which Figueroa received on December 9, 2018, reflects that Sims had been "noted with a recent rectal bleed." Id. Montoya also wrote Sims had "[p]ossible GI bleed," his "[s]tool [was] guaiac negative on examination," and Sims had "been referred to Gastroenterology twice, but has not yet been seen." Id. Sims met with Figueroa on the

13

same day after his appointment with Montoya. Resp. Ex. M. The report does not contain any reference to rectal bleeding. Id. On January 10, 2019, Montoya submitted on Sims' behalf a request for a consultation with a gastroenterologist because of Sims' recent rectal bleeding. Resp. Ex. N. Figueroa saw Sims the next day. A report from that encounter reflects that Figueroa wrote, "GI bleeding already addressed with patient." Resp. Ex. O. On January 15, 2019, upon Sims return from an appointment, the nurse noted that Sims did not voice any complaints at the time of her review of him. Id. The last document related to Sims medical care reflects that on March 23, 2020, the Regional Medical Clinic requested on Sims behalf a consult with a gastroenterologist, which ultimately was granted, and Sims was seen by a gastroenterologist in April of 2020. Resp. Ex. P. The gastroenterologist's report reflects that Sims had gastrointestinal bleeding and severe hemorrhoids. Id. The doctor recommended "flexible sigmoidoscopy w/Bandig."

Sims exhibits establish that his rectal bleeding began following his August 2017 colonoscopy and that medical staff, including Figueroa, were aware of his rectal bleeding and regularly saw him for it as soon as September of 2017. Figueroa and prison staff twice requested gastroenterology consults for Sims within three months of the colonoscopy, once in September and again in October. Resp. Exs. A; B; D. Although Sims disagrees with Figueroa's treatment plan, he fails to point to any evidence that Figueroa was deliberately indifferent to his medical condition. To the contrary, the record reflects that Figueroa regularly examined Sims, prescribed medication, discussed his treatment plan, and on two occasion requested a gastroenterology consultation for him. Accordingly, these records refute Sims' claim that Figueroa ignored Sims' rectal bleeding. Indeed, Figueroa attempted twice in the early stages of the bleeding to get a

14

gastroenterology consult for Sims just as Sims requests in his Complaint. Ultimately, however, Figueroa, in discussion with the regional medical doctor, determined Sims' rectal bleeding was caused by his hemorrhoids and could be handled onsite at the prison.[5] Resp. Ex. K. In fact, the gastroenterologist who saw Sims in April of 2020 determined the same, although he prescribed a different treatment plan. The evidence reflects that Figueroa regularly saw Sims and prescribed him medication. At some point, Sims' rectal bleeding, under Figueroa's care, even subsided without seeing a gastroenterologist. Nevertheless, the rectal bleeding was a reoccurring issue, for which Sims received onsite treatment until April of 2020, when his consult request was ultimately granted.

Sims' disagreement with Figueroa's treatment plan is insufficient to create a genuine issue of fact as to his deliberate indifference claim. See Bismark, 213 F. App'x at 897. Indeed, whether a prison physician should have employed a different form of treatment "'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams, 61 F.3d at 1545. Based on this record, it cannot be said that Figueroa ignored Sims' serious medical issue. Instead, Figueroa regularly tracked Sims and provided him with a treatment plan. While perhaps not the treatment plan Sims desired, he points to no evidence from which a jury could conclude that the treatment given to Sims was so grossly incompetent as to shock the conscious or that it caused an exacerbation of his condition.

---

[5] The exhibits show that the gastroenterologist who conducted the August 2017 colonoscopy made the initial diagnosis of the cause of the rectal bleeding as hemorrhoids, Resp. Ex. K, and Figueroa did as well following his own examination of Sims' rectum, Resp. Ex. E.

15

Notably, the Eleventh Circuit has emphasized that "minimally adequate care" is "quite minimal" under the Eighth Amendment. See Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1277 (11th Cir. 2020).; see also Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)) (recognizing that medical care is not constitutionally required to be "'perfect, the best obtainable, or even very good.'"). Sims presents no evidence supporting even an inference that the care he received was not, at least, minimally adequate care.

To the extent Sims asserts cost-savings played a role in Figueroa's treatment, Sims presents no evidence that Figueroa was motivated by a desire to reduce costs or that he had input into the financial policies for Centurion. Even if he had, the Eleventh Circuit has recently explained that "the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive." Hoffer, 973 F.3d at 1277. However, "if a particular course of treatment is indeed essential to 'minimally adequate care,' prison authorities can't plead poverty as an excuse for refusing to provide it." Id. Here, because Sims fails to point to evidence suggesting that the care provided by Figueroa was not at least minimally adequate medical care, his suggestion that cost savings played any role in the treatment decisions is unavailing. Accordingly, Sims has failed to present evidence creating a genuine issue for trial on the claim that Figueroa was deliberately indifferent to his rectal bleeding and the Motion is due to be granted.

In consideration of the foregoing, it is now

**ORDERED**:

1. Sims' Motion to Compel Discovery (Doc. 36) is **DENIED**.

2. Figueroa's Motion to Withdraw Admissions (Doc. 39) is **GRANTED**.

3. Figueroa's Motion for Summary Judgment (Doc. 38) is **GRANTED.**

4. The Clerk of Court shall enter judgment in favor of Alexis Figueroa, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 28th day of January, 2021.

MARCIA MORALES HOWARD
United States District Judge

Jax-8

C:
William Sims #381271
Counsel of Record